## HEARD *v.* GEORGIA SLATE COMPANY *et al.*

1. While one occupying a fiduciary relation to another can not utilize his position to make a secret profit for himself, the facts of the present case are not such as to make the rule applicable, or to require a recovery on the basis of it.

2. There was no error in overruling the exceptions of law and fact to the auditor's report.

JANUARY 11, 1911.

Exceptions to auditor's report. Before Judge Edwards. Polk superior court. September 3, 1909.

Mrs. Mary E. Heard filed her equitable petition against the Georgia Slate Company, the Southern States Portland Cement Company, and Hugh F. VanDeventer, for an accounting, injunction, the appointment of a receiver, and for general relief. So far as they need be set out the salient facts (taken largely from the report of the auditor) are as follows: Mrs. Heard (formerly Mrs. Jones) was the owner of certain land. She entered into an agreement with the Georgia Slate Company with regard to the sale to it of such land for $21,500, payable $1,500 in cash and the balance by an application of one half the net profits arising each year. Later this agreement was superseded by another, and on August 13, 1896, she executed a deed to the company for the recited consideration of $21,500, but in fact only $5,500 was paid. On the same day she and the company entered into a contract which contained the following provisions: "Whereas Mrs. Mary E. Heard, of Rome, Georgia (formerly Mrs. Mary E. Jones, of Rockmart, Georgia), and her husband E. A. Heard, by warranty deed bearing date this day, in consideration of $21,500 dollars and other valuable considerations have granted, bargained, sold, and conveyed to the Georgia Slate Company, a corporation created by and under the laws of Georgia, and having its principal place of business at Rockmart, Georgia, certain lands and premises in the County of Polk and State of Georgia, which said lands and premises are particularly described by metes and bounds in the said deed, to which, the same being intended to be placed of record in said Polk County, reference is hereby made for more particular description; and whereas the premises and agreements hereinafter set forth formed a part of the consideration for said conveyances: Now, therefore, in consideration of the premises, and of one dollar in hand paid, the receipt of which is hereby acknowledged, the said company hereby promises and agrees that in the event that it shall, within ten years from the date hereof, sell and convey said lands and premises, and appurtenances, so conveyed to it, said company will account to and pay over to said Mary E. Heard, one half of the surplus which it shall receive for such

sale over and above the sums which the said property shall have cost the company up to the time of sale, including in such cost the purchase-price paid, and the sums expended for buildings, machinery, and other improvements, and for prospecting, developing, and working the quarries and interest therein, and also including all the expenses, commissions, and charges connected with such sale. Such principal sums to be reimbursed are stipulated to be at the date hereof $30,000, to which shall be added such further outlays of the nature mentioned as shall be incurred up to the time of sale. But it is expressly understood and agreed that nothing herein contained shall in any wise be taken to limit or restrain the said company in its absolute right and power, to sell, lease, or otherwise dispose of said lands and premises as it shall deem fit and proper, on such terms and conditions as it alone shall or may choose and determine, as being for its interest, in like manner in all respects as if this agreement had not been made; it being hereby declared to be the true intent and meaning of this agreement, that, in the event of the sale of said property within the period stated, the said company shall first be reimbursed from such sale for all the outlays of every name and nature, including interest, incurred in or about the purchase, improvement, and development of the property, and the losses sustained in carrying on its business of quarrying, manufacturing, and selling slate, in connection with said premises, and in making sale of said premises, together with interest on such outlays, and after such reimbursement and the company shall have been made whole, the surplus remaining shall be divided equally in kind, between said company and Mrs. Heard. But nothing herein contained shall be in anywise deemed or taken to require a sale by said company, within the period mentioned, of the property to which this agreement relates. It being the intent that it shall be wholly optional with the company to sell or not, at its discretion." This agreement was executed on behalf of the company by Hugh F. VanDeventer, president, and attested by the secretary. Hugh F. VanDeventer had no substantial interest in the company, the stock being practically owned by his father, J. VanDeventer, and one Craig. The company's business of quarrying, preparing for market, and selling slate was not profitable, and it became indebted in the sum of $24,976.14, which was partly due to J. VanDeventer, and partly assigned to him. Repeated efforts

were made by the Slate Company to sell the property, which were without success, although it was offered for $30,000, and less. After 1896 the quarry was not operated by the company, though worked for a short time under a lease from it. Hugh F. VanDeventer had studied metallurgy, mining engineering, and geology. As far back as 1894 he knew that slate, shale, and limestone could be brought together to make cement. In the latter part of 1900 he found that Portland cement could be made of it, and determined to organize an enterprise for that purpose. In 1901 samples of slate and limestone were taken from a number of places on other lands than the Heard land, and samples of slate were taken from "dump slate" on that property and another tract, and analyses were made. One Cowham had analyses made. On January 28, 1901, at a meeting of the stockholders of the Slate Company, it was unanimously resolved to make to Hugh F. VanDeventer a deed to all the property and plant for $30,000, which deed was to be executed and placed in escrow with J. VanDeventer, to be delivered to the grantee upon payment of the consideration in cash or negotiable paper before July 1, 1901. This deed was signed by the vice-president. At a meeting of the stockholders on July 8, 1901, a resolution was adopted that the proposed sale or option be continued until December 31, 1901, and that the additional time should be allowed for consummation. W. F. Cowham was connected with various cement companies. In August, 1901, he came to Georgia, and Hugh F. VanDeventer procured a meeting with him, it being represented to VanDeventer that Cowham was a capitalist and could furnish finances for buying properties and building a mill. VanDeventer had an option on another tract of land known as the Devers tract, containing slate. In October, 1901, he obtained an option on another tract known as the Nettles tract, which also contained slate of the necessary chemical combination, and which lay next to the land containing limestone. There was evidence tending to show that he did this for the benefit of the Cement Company, and that the latter paid the purchase-money. The auditor found, that VanDeventer obtained options on what were known as the Devers land, the Hogue land, and the Morgan land, paying for the Nettles land $1,000, and bargaining to pay for the Morgan land $2,000, and for the Hogue land $2,500; that he effected an arrangement with Cowham in connection with

the organization of the Cement Company, and transferred the options to Cowham, and the latter afterward deeded the land covered by them to the Cement Company; and that it or Cowham paid the amounts due for the purchase-money and also repaid the $1,000. VanDeventer had had negotiations with a railroad company near by, in regard to rates which might be had for a cement manufacturing company, had gone east in person and obtained promises of favorable rates, had paid for examinations of titles to land, for chemical analyses and tests, and for preliminary investigations for a proposition to manufacture cement at that place, and had devoted something like a year to the proposed establishment of a cement plant. He had certain negotiations with Cowham. Upon arriving at a satisfactory understanding, the proposition was laid before a meeting of all the stockholders of the Slate Company, in regard to the purchase of its property, and a resolution was adopted authorizing a conveyance to Cowham upon the terms stated. The Slate Company was to execute a deed to Cowham upon receipt of his two notes for $3,750 each, due at six and twelve months respectively, together with an agreement that Cowham was to deliver to the Slate Company preferred stock of the Cement Company, which was to be organized, to the amount of $22,500. The vice-president, Craig, and James VanDeventer were familiar with the interest of Hugh F. VanDeventer in the proposed Cement Company. The deed from the Company to Cowham was dated December 2, 1901, and recited a consideration of $30,000.

On December 12, 1901, Cowham and H. F. VanDeventer entered into the following written agreement. "These articles of agreement witnesseth: Whereas it is contemplated and intended to build a Portland Cement Mill at Rockmart, Georgia, on the lands controlled by H. F. VanDeventer of Knoxville, Tennessee; the Portland Cement proposition having been developed and proven by said VanDeventer; and whereas Mr. W. F. Cowham, of Jackson, Michigan, has visited the properties, investigated the feasibility of the project, and is ready, with said VanDeventer's co-operation, to build and put in operation a cement mill on the above properties: therefore, it is understood, and by these presents agreed, by and between said Cowham and VanDeventer, to undertake the formation of the Cement Company and building of the mill on the following plan: Said Cowham and VanDeventer to be equal in every way;

they to have the land of said VanDeventer at fifty thousand ($50,-000.00) dollars in money and stock, and to turn it over to the company at one hundred thousand ($100,000.00) dollars stock; the land of the Georgia Slate Company to be taken part money and part stock as arranged by agreement with said Slate Company and said Cowham. And for his experience and mill influence and association, Mr. Cowham is to receive fifty thousand ($50,000.00) dollars of the common stock of said Portland Cement Company. The Portland Cement Company is to give J. S. Irvin five thousand ($5,000) dollars of preferred stock and twenty-five hundred ($2,500.00) dollars worth of the common stock that goes with it, and three thousand ($3,000.00) dollars a year and traveling expenses for himself and wife while in the employ of the company. Mr. N. S. Potter is to receive from the company five thousand ($5,000.00) dollars preferred and its bonus of two thousand, five hundred ($2,500.00) dollars, in common stock. Mr. McCourtie is to receive from the Company the same amount as Mr. Irvin, if the Company decides to avail itself of his services. The Engineering Company is to receive ten per cent. of the cost of the plant and its traveling expenses and hotel bills incurred in its erection. This agreement is based on the formation of the Southern States Portland Cement Company now in progress of organization under the laws of Georgia, and contemplates the issue of seven hundred and fifty thousand ($750,000.00) dollars of preferred stock and one million two hundred and fifty thousand ($1,250,-000.00) dollars of common stock, authorized under the charter of said Southern States Portland Cement Company, and it is the understanding that the common stock of one million two hundred and fifty thousand ($1,250,000.00) dollars of said Southern States Portland Cement Company, less fifty thousand ($50,000.00) dollars which goes to said Cowham for his influence as above expressed, and the fifty per cent. bonus going to the preferred stock under the plan of organization of said company, shall be equally divided between said Cowham and VanDeventer." The option on the Devers land was released. The plan of organization of the Cement Company was that all the preferred stock carried with it a bonus of fifty per cent. of common stock. H. F. VanDeventer did not receive any part of the money arising from Cowham's notes to the Slate Company, nor any part of the preferred or com-

mon stock delivered by Cowham to the Slate Company. Out of the entire transaction he received $40,000 of preferred stock and $361,-350, of common stock in the Cement Company. The value of this was at the time uncertain, but since then one or more dividends have been paid on preferred stock, and some of it has been sold for par or less. The common stock does not appear to have any market value. The auditor found that the property of the Slate Company, which it had obtained from Mrs. Heard, was well sold at $30,000, and that it was doubtful if it was worth that much; and that there was no lack of slate lands or of limestone lands in the vicinity, the products of which could be used to make Portland cement. He found in favor of the defendants. Exceptions of law and fact were filed to his report, which were overruled, and a decree entered accordingly. The plaintiff excepted.

*King & Spalding, Dean & Dean,* and *Bunn & Bunn,* for plaintiff.

*McDaniel, Alston & Black* and *John L. Tison,* for defendants.

LUMPKIN, J. (After stating the foregoing facts.)

There was no partnership created between Mrs. Heard and the Slate Company or VanDeventer. Civil Code, §§ 2626, 2629; *South Carolina & Georgia R. Co.* v. *Augusta Southern R. Co.,* 107 *Ga.* 164 (33 S. E. 36). Nor was any technical trust created for her. Civil Code, § 3148. The controlling question is whether there was such a quasi trust or fiduciary relation existing between her and the company or H. F. VanDeventer as to authorize her to have an accounting for the amount of stock received by him in excess of the $30,000 expressed in the deed from the company to Cowham. The rule is well settled that a person occupying a fiduciary relation can not make a secret profit out of it, and that one who is charged with the duty of selling for another can not become the purchaser without the consent of such other person. In the present case the difficulty of arriving at a decision arises, not so much from differences as to rules of law in the abstract, as from the application of them to the facts of the case. As between Mrs. Heard and the Slate Company the contract which they made negatives incidents which ordinarily follow either an express trust or a quasi trust resulting from a fiduciary relationship. It contains, among other things, the following statement. "But it is expressly understood and agreed that nothing herein contained shall in any wise be taken to limit or restrain the said Company in its absolute

right and power to sell, lease, or otherwise dispose of said lands and premises as it shall deem fit and proper, on such terms and conditions as it alone shall or may choose and determine, as being for its interest, in like manner in all respects as if this agreement had not been made." Again, it says: "But nothing herein contained shall be in any wise deemed or taken to require a sale by said company, within the period mentioned, of the property to which this agreement relates; it being the intent that it shall be wholly optional with the company to sell or not, at its discretion." Thus there was no duty on the part of the company to make a sale; and if it did so, it was to be guided by its own interests, as if no agreement had been made. The only obligation was, that, in case a sale should be made, after reimbursing the company for the stipulated amount of $30,000 and future outlays, it would pay to Mrs. Heard one half of any surplus received for the property. Such an obligation was rather contractual than fiduciary.

The president and directors of the corporation were, in a certain sense, trustees for the corporation and its creditors,—for the latter more particularly if insolvency of the corporation should occur. They occupied a fiduciary relationship toward the company. But there was no absolute prohibition against one of them entering into a contract with the corporation, with full knowledge and consent on its part, and when it was represented by other directors and agents. Hugh F. VanDeventer did not act for the Slate Company and also for himself in the making of the trade. The auditor found, and the evidence justified the finding, that the company and its other directors were fully apprised of the facts, and the latter acted for it. There was no unfair dealing or concealment on the part of VanDeventer toward the company. The price paid for the Heard property was all that it was worth. True, VanDeventer, by reason of expert knowledge in regard to the making of cement, took part in the formation of a cement company to which the Heard property was conveyed; but making cement was no part of the business of the Slate Company, nor did VanDeventer receive pay from it for services in regard to the cement company. The amount to be paid to the Slate Company was received by it, and none of that consideration was paid to VanDeventer. In connection with the organization of the Cement Company he received an amount of stock. But the facts disclosed by the evidence do,

not show that he was either directly such a fiduciary agent of Mrs. Heard, or that he was such a fiduciary agent of a fiduciary agent of hers as authorized her to have an accounting from him. The auditor found that there was no fraud; that Mrs. Heard was entitled to recover nothing from the Slate Company under the contract between them; and that she was entitled to recover nothing against VanDeventer. We think that the evidence justified his finding, and that the presiding judge did not err in overruling the objections thereto.

*Judgment affirmed. All the Justices concur, except Fish, C. J., absent.*